DEXTER v. FIRST GUARANTY STATE BANK et al. (No. 871.)

(Court of Civil Appeals of Texas. Amarillo. Dec. 11, 1915.)

1. BANKS AND BANKING ☞96—ULTRA VIRES CONTRACTS—SEPARABLE CONTRACTS.

Where certain banks and an individual associated themselves to trade in cotton, and insured cotton in which they were to deal against certain perils, agreeing to pay premiums on the 15th day of each month for the preceding month, which agreement was reduced to writing and signed by "West & Co., Assured," the name under which the banks and their partner did business, they were liable on such agreement, since the contract for insurance was separate and apart from the partnership agreement, and was not in itself ultra vires.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 230; Dec. Dig. ☞96.]

2. BANKS AND BANKING ☞96—IMPLIED CONTRACT.

Such banks were liable, apart from the question of ultra vires, upon quasi contract for premiums due under the policies.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 230; Dec. Dig. ☞96.]

3. BANKS AND BANKING ☞101 — ULTRA VIRES CONTRACT — FORMATION OF FIRM — RECOVERY OF PROFITS BY PARTNER.

Where banks made an ultra vires association with a natural person to deal in cotton, such natural person could recover from them his share of any profits made by the firm, or, if the relation of principal and agent existed be-

tween the banks and himself, any compensation due him, since corporations must perform the obligations imposed upon them by their ultra vires contracts fully executed by the other contracting party.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 237, 238; Dec. Dig. ☞ 101.]

Error from District Court, Hardeman County; J. A. Nabors, Judge.

Action by George J. Dexter against the First Guaranty State Bank and another. To review a judgment of dismissal, plaintiff brings error. Reversed, and cause remanded.

Locke & Locke, of Dallas, for plaintiff in error. M. M. Hankins, of Quanah (Jno. W. Veale, of Amarillo, of counsel), for defendants in error.

HALL, J. Plaintiff in error, as the assignee of the causes of action, instituted this suit to recover from the First Guaranty State Bank and the Citizens' National Bank of Quanah premiums alleged to have been due the Home Insurance Company and Royal Insurance Company, Limited, of Liverpool, on certain policies issued by such companies, respectively, in favor of West & Co., of Quanah, Tex., covering certain bales of cotton. The defendants filed general and special exceptions, all of which were sustained by the court. The plaintiff declining to amend, the suit was dismissed.

We adopt from appellant's brief the following as the substance of the material allegations of the petition:

"(1) The Home Insurance Company issued its policy No. 305, whereby, in consideration of a premium hereinafter to be specified, it insured 'West & Co., of Quanah, Tex., * * * on cotton in bales,' etc.

"(2) Premium was agreed upon, and policies specified 'that the assured should pay such agreed premium * * * on the 15th day of each month for the preceding month.' Premium agreement reduced to writing and attached to policy and is copied in petition. It is signed by 'West & Co., Assured,' and promises payment of premiums as stated.

"(3) After issuance of policy, and as required therein, West & Co. furnished daily reports of cotton handled, and, in accordance with the same, premiums became due of certain amounts, detailed statements of which are attached to the petition.

"(4) Though the premiums shown thereby to be due for certain months were duly paid, the premiums shown thereby to be due for the months of December, 1912, and January and February, 1913, amounting to $377.32, are unpaid.

"(5) The plaintiff has reason to believe that reports furnished by West & Co. of cotton handled are incorrect, and has been informed by West & Co. that on February 1, 1913, they had on hand 1,721 bales, instead of 751, as reported, and on account of this difference alone the premium for the month of February, 1913, alone, would be increased by more than $125. The policy provides that the company shall be permitted to examine the books of the assured and its correspondents for the purpose of verifying the accuracy of the reports, and company demanded in February, 1914, permission to examine books of West & Co., and also defendant banks, and such requests were refused. Plaintiff alleges on information and belief that

there was due to the insurance company, at the time of the termination of the policy in February, 1913, and yet remains unpaid, the sum of $1,000 for premiums, in addition to the sum of $377.33 above mentioned.

"(6) Royal Insurance Company, Limited, issued its policy No. M—107883, 'whereby it insured West & Co., of Quanah, Tex., against certain adventures and perils on cotton in bales,' etc.

"(7) The policy was issued in consideration of premiums at agreed rates to be paid to the company on demand on account of all shipments made thereunder.

"(8) West & Co. made various shipments of cotton coming within the terms of the policy and sent memoranda thereof to the company, as required by the policy, and according to such memoranda premiums of certain amounts became due for such shipments, detailed statements of which are attached to the petition.

"(9) Premiums for shipments during certain months were paid to the company, but premiums for shipments during the months of December, 1912, and January, 1913, and for errors in premiums on shipments in previous months, amounting to $1,233.43 in all, remain unpaid, though demand for the payment thereof has often been made.

"(10) West & Co., named as assured in said policies, consisted of one T. J. West, of Quanah, Tex., and the defendant banks. West & Co. was a trade-name used by them in buying, selling and shipping cotton under the arrangement hereinafter set out. T. J. West was the active manager of said business, but the defendants were the owners (each, in entirety, of a portion) of all the cotton bought, sold, or shipped in the course thereof, and the said West, in dealing with reference to such cotton, was acting as their agent; that is to say as the agent of whichever of them owned such cotton.

"(11) In the summer or early fall of 1912, prior to the purchase of any cotton under which premiums became due to said insurance company under said policies, the said T. J. West entered into an agreement separately with each of the defendant banks in substance wholly or partly as follows: The said T. J. West, who was regarded by each of said banks as an intelligent, experienced, well-informed, and competent cotton man, as well as a man of integrity, would conduct a cotton business in the name of West & Co.; the said West under said name would negotiate the purchase of cotton and the sale of the same; the bank would supply all the money necessary for the purchase of such bales of cotton as the said West might call upon it for; it would take the title to the cotton in itself at the time of furnishing or paying for the purchase of the same, and would retain such title and all the symbols and evidence of the ownership and possession of said cotton, until a sale satisfactory to itself was negotiated by the said West, when it would transfer the title and surrender the symbols and evidence of ownership and possession in exchange for the proceeds of such sale; and that a certain method would be pursued in the conduct of the business as is set out at length in the petition.

"(12) Such arrangement was followed, 'and all the bales of cotton on which any premiums became due to said insurance companies under said policies were entirely paid for by one or the other of said banks, and the property therein passed to the bank which paid for the same, and remained in such bank, unless sold to the other bank, during all of the time when the same was subject to any risk covered by either of said policies. All of the premiums due under said policies were owed on account of cotton purchased by one or the other of said banks as aforesaid, and were earned during the time when such cotton remained the property of one or the other of said banks.'

"(13) Before said banks, or either of them,

would provide any money for the purchase of any cotton under the arrangement aforesaid, said banks, and each of them, insisted that insurance on said cotton should be obtained against the peril of fire, so that they would be protected from any loss which might occur while they were the owners of said cotton, and also that insurance should be obtained against all perils on cotton, the sale of which ·was negotiated by the said West, during the time that the same· was in course of shipment to the purchaser, so that they would be protected in the credit which they extended upon the receipt and acceptance of a draft drawn on such purchaser for the amount of the purchase price. Accordingly, at the special instance and request and by the direction of each of said banks, and for the use and benefit of each, as to all cotton or drafts purchased by it as aforesaid, the said West, in the name of said West & Co., applied for and obtained from said company said policies of insurance. Said policies were delivered immediately upon their writing to the custody and possession of the defendant the First Guaranty State Bank, and have ever since so remained, except that the policy of said the Home Insurance Company was delivered up to said company and canceled on February 14, 1913, and that said Royal Insurance Company, Limited, policy was delivered up and canceled in June, 1913. In procuring said policies from said companies the said West was acting as the agent and representative of each of said banks. Said banks were at all times the owners of the cotton at risk under said policies, or of the drafts to which certificates of insurance were attached, and the benefits of said policies accrued directly and immediately to them. They knew that said policies had been obtained, they knew the· terms thereof, and knew that premiums were daily accruing to said companies thereunder, and that said companies were expecting payment for the same. They knew, also, that they were substantially the sole beneficiaries of said insurance, and that the premiums thereon would be paid only out of funds supplied by them or derived out of said cotton. With such knowledge they accepted the benefit of such insurance, and became bound to pay for the same, and they expected and intended to pay for the same. All the premiums aforesaid that were paid to either of said companies as aforesaid were paid, or the moneys were supplied for such purpose, by one or the other of said defendant banks. * * *

"(18) By reason of the premises aforesaid, each of said defendant banks became liable and promised to pay to each of said companies the premiums accruing to such company under its said policy on account of all bales of cotton for which it supplied the purchase price and took the title as aforesaid, and on account of all shipments of cotton in connection with which drafts drawn in the name of said West & Co. on the purchaser thereof were purchased and owned by such banks, etc.

"(19) Neither the plaintiff, however, nor either of said insurance companies, has any knowledge as to number or value of the bales of cotton owned during said months by either of said banks, or what portions of such premiums are due and payable by either.

"(20) After said premiums matured and remained unpaid, demand was made by said insurance company upon each of said banks for the payment thereof; but they wholly failed and refused to pay the same, and the same remain wholly unpaid."

The following are the special exceptions which were sustained:

"(a) Said petition fails to show any mutuality between the plaintiff and these defendants:

"(b) Said petition fails to show that these defendants had knowledge of the fact of the non-payment of the premiums contracted to be paid by West & Co.

"(c) The same fails to show any agreement upon the part of these defendants to pay the premiums due and owing by West & Co.

"(d) The same fails to show that these defendants knew or were chargeable with the knowledge of the nonpayment of said premiums.

"(e) The facts pleaded by plaintiff, seeking to show a partnership, are insufficient to establish a partnership.

"(f) 1. The facts stated, if they did show a partnership, would be such a partnership as would be void in law on account of the incapacity of a state bank or a national bank to enter into a partnership. 2. Such partnership as alleged would be against public policy and void.

"(g) Because under the law of the· state of Texas a state bank cannot enter into a partnership such as is attempted to be set up in plaintiff's petition. .

"(h) That this court has no jurisdiction of this suit, for the reason that the amount sued for is less than $500, while it is stated in subdivision 5 of plaintiff's petition that they have an idea that West & Co. owe them $1,000 in addition to $377.33, yet there are no facts alleged as against these defendants which could be a basis for any charge, and especially any charge over and above $377.33, and these defendants now here say that this court is without jurisdiction to hear and determine this cause.

"(i) That the exhibits attached to said petition show by their terms that West & Co., even, were they parties to this suit, were not insured and they could not recover on any claim for loss; neither could any other party recover anything on said policies. By reason of the stipulations contained in the policies they were exempt from liability of any third party, and if West & Co. were parties to this suit they could successfully plead failure of consideration herein, which is now here pleaded so far as the same may affect these defendants."

In addition to the statement hereinbefore made, as to the substance of the petition, the plaintiff alleged in paragraph 14 that on February 3, 1914, West & Co. drew a check on the defendant the First Guaranty State Bank in favor of one S. J. Matthew, the agent of the Royal Insurance Company, Limited, in the sum of $538.46, that being the amount due on premiums for the month of December, 1912; that Matthew presented the check to the drawee bank; that the same was marked "Paid," and a deposit slip for the amount thereof was delivered to the said· Matthew; that thereafter, on the same or the next day, the bank struck the credit from its books and erased the paid stamp on the check, returning the same to Matthew, and obtained from Matthew, without the knowledge or consent of the insurance company, said deposit slip. In paragraph 16 of the petition it is alleged in substance that on February 4, 1913, after the recall of the deposit slip, Matthew, acting in behalf of the insurance company, informed said banks that the companies would immediately request the cancellation of their policies, upon learning of such circumstance, and inquired whether the banks desired such policies terminated; that the banks protested against the cancellation of the policies, and promised, each with respect to the cotton belonging to it, and covered by said policies, that it would pay all premiums thereafter ac-

cruing; that said company, in reliance upon such promises, permitted said policies to continue in force. It is further alleged in paragraph 17, in substance, that since said last-named date there became due to the Home Insurance Company $70.97, as premiums under its said policy. These paragraphs allege an express contract, and there seems to be no contention upon the part of appellees with reference thereto.

The first counter proposition urged by appellees is that:

"Recovery founded upon an ultra vires contract void in law cannot be had directly or indirectly, where in order to maintain such recovery it is necessary to look to or to have recourse to such contract, nor can the parties to it by subsequent acts, or the courts, infuse life into it."

This is the principal question raised upon this appeal. In support of the proposition, we are cited by appellees to decisions rendered by the Supreme Court of the United States and the decisions of state courts other than our own.

[1-4] That the allegations in the petition are a sufficient declaration upon an express written contract must be admitted, and but for the issue of ultra vires their sufficiency as against a general demurrer could not be questioned. This is also true of that portion of the petition which declares upon a quasi contract. It may be conceded that the defendant banks were not authorized by their charters to enter into a partnership or any other business arrangement with West under the terms of which they could become the owners of cotton purchased upon the open market, to be thereafter sold, either for their joint or several account. Such an agreement on the part of the corporations is manifestly ultra vires. The plaintiff's allegations, however, do not show that the insurance companies were parties in any sense to that agreement. Under the allegations, as we understand them, the insurance companies were not concerned in either the success or failure of the business venture. They were entitled to their premiums, whether the cotton transactions resulted in profits or losses. Their undertaking was collateral to the purpose and intention manifested by the contract to buy cotton. In the very nature of things, they would not be entitled to premiums, nor could they become liable for losses, until cotton had been acquired by West & Co. Their connection with the ultra vires transactions and operations described in the petition was purely a contingent one. Granting the invalidity of the contract, or business arrangement between West and the defendant banks, because it was ultra vires, it in no degree taints the separate contract alleged to have been made between the banks and insurance companies.

It cannot be successfully asserted that the act of a corporation in insuring its property, or property in which it has an interest, is ultra vires. The right to insure the building and fixtures owned and used by it in pursuing its legitimate business is an incidental power, and need not be set out in its charter; nor do we think the law condemns a contract of insurance entered into for the protection of its property, even though it be acquired through an ultra vires act. The property itself is not on this account absolute contraband. This suit is not based on the contract to buy cotton, but on the one to pay premiums due upon policies covering cotton alleged to be owned by defendants. Even though the cotton was obtained by the exercise of an authority not granted them by law, it is nevertheless the absolute property of the banks, and any contract which they may see fit to make with reference to its insurance, storage, or sale, if otherwise legal, would not be invalidated because they acquired it by exceeding their corporate powers. It is uniformly held in numerous Texas cases that corporations must perform the obligations imposed upon them by their ultra vires contracts when the same have been fully executed by the other contracting party. North Side Ry. Co. v. Worthington, 27 S. W. 746; Steger v. Davis, 8 Tex. Civ. App. 23, 27 S. W. 1068; Edwards County v. Jennings, 33 S. W. 585; Galveston & W. Ry. Co. v. City of Galveston, 37 S. W. 27; First National Bank of Greenville v. Greenville Oil & Cotton Co., 24 Tex. Civ. App. 645, 60 S. W. 828; Continental Fire Ass'n v. Masonic Temple Co., 26 Tex. Civ. App. 139, 62 S. W. 930; Kincheloe Irrigation Co. v. Hahn Bros. & Co., 105 Tex. 231, 146 S. W. 1187; San Antonio Hardware Co. v. Sanger, 151 S. W. 1104; Phœnix Land Co. v. Exall, 159 S. W. 474.

Under this rule, even West could recover from the banks his share of any profits, if a partnership existed, or his compensation, if the relation of principal and agent existed, which might be shown to be due him. For a stronger reason, the defendant banks should not be permitted to take the protection afforded them by the policies of insurance, and avoid a just indebtedness growing out of it, by setting up an illegal contract between themselves and West; and because plaintiff's petition may disclose the existence of such a contract does not render it subject to demurrer. The Texas courts have never given ear to such defense. In Wallerstein v. Ervin, 112 Fed. 124, 50 C. C. A. 129, decided by the Circuit Court of Appeals for the Eastern District of Pennsylvania, where a corporation had entered into a similar arrangement as is disclosed by the record in the instant case, and sought to avoid the effect of the relation by alleging that it acted ultra vires in advancing the money to Ervin & Fagin in the prosecution of the firm's business, it is held that the corporation was not entitled to file its claim in the bankruptcy proceedings of the firm, and have the same allowed, using this language:

"These transactions were, at the time of the adjudication of bankruptcy, fully executed, and the appellant could not avoid the legal consequences of what it had already completely done by showing that in so doing it had overstepped the bounds of its lawful authority. The trustee in bankruptcy did not seek to enforce an ultra vires contract, nor to compel a performance of any of its provisions. He simply insisted that a status which had been created by what had actually occurred should not, at the instance of a party to its creation, and to the prejudice of innocent third parties, be utterly ignored, and we think that in sustaining this insistence the court below was clearly right."

See, also, 4 R. C. L. §§ 581, 678, 680, 681.

It is our opinion that the court erred in sustaining the general and special demurrer, and dismissing the case.

The judgment is reversed, and the cause remanded.

10. MECHANICS' LIENS ⬥277 — ACTION TO ENFORCE—ISSUES—SURETYSHIP.
In a suit against an individual, his surety, and a street railroad company for the value of materials furnished to the individual, as the company's lessee or agent, and used by him in improving the company's property, an answer

---

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes